IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LOUIS GILLIAM,                          )
                 Plaintiff,          )
                                  )
    vs                                  )          Civil Action No. 13-1557
                                    )
VERIZON PENNSYLVANIA, INC.,             )
                 Defendant.          )

## MEMORANDUM AND ORDER

Presently before the Court is a motion for summary judgment pursuant to Federal Rule of

Civil Procedure 56, filed by the Defendant. For the reasons that follow, the motion will be

denied.

Plaintiff, Louis Gilliam, brings this action pursuant to 42 U.S.C. §§ 2000e to 2000e-17

(Title VII), alleging that Defendant, Verizon Pennsylvania, Inc. ("Verizon"), discriminated

against him on the basis of his race (African American) and in retaliation for complaining about

racial discrimination when it suspended him and later terminated him from his position as a

Systems Technician on April 20, 2012 (allegedly on the basis his involvement in the sale or

transfer of illegal drugs, his "failure to cooperate" with an internal Verizon investigation and his

act of keeping a Verizon van after his workday was over and returning it to a different garage)

and when it failed to reinstate him once the criminal complaint that had been filed against him

was dismissed on December 11, 2013.

Facts

Plaintiff worked at Verizon from on or about May 18, 1998 until he was terminated on

April 20, 2012. (Second Am. Compl. ¶ 9.)[1] Plaintiff worked as a Systems Technician in

---

[1] ECF No. 45.

Pittsburgh, Pennsylvania. He received excellent reviews. (Gilliam Dep. Vol. 1, 37:4-16.)[2]

Plaintiff primarily worked alone at "off-site" customer locations within his assigned territory,

which spanned generally from downtown Pittsburgh east to Monroeville. (Id. at 43:5-21, 45:18-

24.) Plaintiff's assigned base worksite was located at 1707 Pennsylvania Avenue near the

Manchester neighborhood of Pittsburgh (the "Pennsylvania Avenue Garage"). (Id. at 42:8-12,

19-22.)

Throughout a regular work day, Plaintiff used an assigned Verizon vehicle to travel

between the Pennsylvania Avenue Garage and assigned customer worksites. (Id. at 45:25-46:9.)

At the end of his tour, Plaintiff had an obligation to return his assigned Verizon vehicle to the

Pennsylvania Avenue Garage. (Id. at 64:11-13 ("Q: You're supposed to return the vehicle back

to Verizon at the end of every shift? A: Yes.").

In 2012, Plaintiff's direct supervisor was Supervisor Brian Pokora ("Pokora"), who

reported to Manager Patrick Flood ("Flood"), who reported to of Director of Network Field

Operations Frank Mattera ("Mattera"). (Mattera Decl. ¶¶ 2-3.)[3]

The Events of March 16, 2012

On March 16, 2012, Plaintiff worked his regularly scheduled tour, which began at 8:00

a.m. and ended at 4:30 p.m. (Gilliam Dep. Vol. I, 42:23-43:4.) That day, Plaintiff had two job

assignments for the U.S. Drug Enforcement Agency ("DEA"). (Id. at 44:11-19.) At

approximately 2:30 p.m., Plaintiff received a telephone call from his neighbor, Ray Harris

("Harris"), in which Harris informed Plaintiff that law enforcement was searching Plaintiff's

home. (Id. at 49:9-23, 50:11-13.)[4] After receiving Harris' call, Plaintiff immediately left his job

---

[2] Def.'s App. (ECF No. 83) Ex. A-1.
[3] ECF No. 83 Ex. B.
[4] Plaintiff denies this statement and several others on the ground that they are immaterial to this

assignment even though he had not completed it. (Id. at 49:9-14.) A DEA Agent later called

Plaintiff and asked to meet with him at Plaintiff's home. (Id. at 53:15-54:12.) Plaintiff did not

comply with the DEA Agent's request to return to his home. (Id. at 55:1-6.)

Several DEA agents, armed with guns, also appeared at Verizon's Pennsylvania

Avenue Garage searching for Plaintiff on the afternoon of March 16, 2012. (Yarnot Dep. 19:2-

23.)[5] Local management contacted Verizon Security and, because the DEA's arrival was

unexpected and the DEA agents were armed and initially refused to explain the reason for their

presence, called the City of Pittsburgh police to the Pennsylvania Avenue Garage. (Yarnot Dep.

19:12-23.) Senior Investigator Brennan Yarnot ("Yarnot") took responsibility as Verizon's lead

investigator in the matter and travelled to the Pennsylvania Avenue Garage with Senior

Investigator John Yock ("Yock"). (Yarnot Dep. 22:11-23:21.)

When Plaintiff's tour ended at 4:30 p.m., he did not return Verizon's vehicle to

the Pennsylvania Avenue Garage as required. (Gilliam Dep. Vol. I, 64:11-16 ("Q: You're

supposed to return the vehicle back to Verizon at the end of every shift? A: Yes. Q: On March

16th you didn't return the vehicle. Correct? A: Correct."). When asked what precluded him from

returning the van to the Pennsylvania Avenue Garage at the end of his shift, Plaintiff testified

that his reasoning was that he wanted to protect Verizon's reputation from any possible

embarrassment. (Gilliam Dep. Vol. I, 65:10-11; see also Arb. Hr'g at 84[6]; ECF No. 83 Ex. F at P

0048-0049.)

Plaintiff admitted that he had no authorization to use the Verizon van after the scheduled

---

case because Verizon was unaware of this information at the time it took adverse employment
actions against him. Nevertheless, he does not deny the veracity of the statements, which are
presented as part of the background.
[5] ECF No. 83 Ex. C.
[6] Pl.'s App. (ECF No. 85) Ex. I.

end of his tour. (Gilliam Dep. Vol. I, 71:12-15 ("Q: Okay. Am I correct you did not have permission to use the van after the end of your shift at four-thirty? A: Yes.").) Yarnot attempted to contact Plaintiff by telephone and left a voicemail message directing Plaintiff to return the Verizon vehicle to the Pennsylvania Avenue Garage. (Yarnot Dep. 31:24-32:19.) Plaintiff testified that the message was that he needed to let Verizon know where the vehicle was so that it could be picked up and that if he did not, it would be reported as stolen. (Gilliam Dep. Vol. I, 94:4-7.)

Despite the fact that Verizon and the DEA were attempting to contact Plaintiff, he could not be reached because he had turned off both his Verizon and personal cell phones. (Gilliam Dep. Vol. I, 88:18-21 ("Q: You don't remember anyone calling you on the Verizon cell or your personal cell? A: I'll be quite honest with you. I turn the Verizon phone off after my tour."); Id. at 95:7-8 ("[The DEA agents] were calling my personal phone. They were going back and forth. I turned it off.").) Plaintiff left the vehicle at a Verizon garage located at 6417 Dahlem Place in the East Liberty neighborhood of Pittsburgh at approximately 8:15 p.m. (the "Dahlem Place Garage"). (Gilliam Dep. Vol. I, 71:1-7.)[7] Plaintiff was not instructed to leave the vehicle at the Dahlem Place Garage. (Id. at 91:5-7 ("Q: Did anyone from Verizon instruct to you take the van to the Dahlem Place facility? A: No.").)

Yarnot and Yock arrived at the Dahlem Place Garage at approximately 8:30 p.m., and, when they arrived, a mechanic working at the Garage reported that an African-American man "came in, almost hit my personal car, came in at a high rate of speed, parked the [Verizon] vehicle, said he had an emergency, the keys were on the desk, he threw the keys on the desk and fled on foot." (Yarnot Dep. 38:18-39:7.) When DEA agents arrived at the Dahlem Place Garage,

---

[7] Plaintiff states that the time when he returned the vehicle is disputed, but he cites his own deposition at page 64:18-21, where he testified that it was "about 8:15."

they searched the Verizon vehicle used by Plaintiff and found "two UPS style envelopes" with no markings. (Yarnot Dep. 40:23-41:22.) A DEA agent told Yarnot that "this was how some of the drugs were being shipped back and forth," referring to the UPS envelopes. (Yarnot Dep. 41:14-16.) Yarnot inspected the envelopes and found no sign that they were related to Plaintiff's work for Verizon. (Id. at 41:17-20 ("…I inspected them, there was no customer information, no Verizon information on them, so we turned them over to the DEA.")

Verizon's Code of Conduct requires all Verizon employees to "cooperate completely in any investigation relating to Verizon." (ECF No. 83 Ex. F at D-000010.) Section 1.9 of Verizon's Code of Conduct prohibits misconduct off the job that could "affect the company's reputation or business interests." (Id. at D-000014.) Section 3.3 of Verizon's Code of Conduct prohibits the use of Company "vehicles for personal purposes." (Id. at D-000021.) Rule J of Verizon's GNSD&A PA/DE Standard Associate Work Rules 2012 also prohibits the use of Company vehicles for personal purposes. (Id. at D-000044.)

Verizon's Drug and Alcohol Policy prohibits the use, transfer, sale, manufacturing, distribution or possession of illegal drugs by Verizon employees while on Company time, premises, in Company owned or leased vehicles or at a Company sponsored event. (Id. at D-000051.)[8] As noted below, Plaintiff has pointed to evidence in the record that Verizon recognized that an allegation of criminal conduct was insufficient and he could not be terminated until he was convicted of the drug charges. (ECF No. 85 Ex. D at 7.)

The Criminal Complaint

On March 18, 2012, the U.S. Government filed a criminal complaint against Plaintiff based on felony charges of "[c]onspiracy to distribute and possess with intent to distribute 5

---

[8] Defendant leaves out the fact that the policy applies on Company time and premises. It also states that it "enforces" this policy, but as Plaintiff notes, the exhibit only describes the policy.

kilograms of more of a mixture and substance containing a detectable amount of cocaine, a

Schedule II controlled substance." U.S.A. v. Gilliam, No. 2:12-mj-00207, ECF No. 1 (Mar. 18,

2012).[9] The U.S. Government also filed an Affidavit of Probable Cause In Support of Criminal

Complaint. U.S.A. v. Gilliam, No. 2:12-mj-00207, ECF No. 1-1 (Mar. 18, 2012).[10] In the

affidavit, DEA Special Agent Kevin W. Black stated under oath that, in February 2012, Plaintiff

had engaged in three telephone conversations regarding what he suspected to be drug activity.

34. On February 2, 2012, at approximately 4:34 PM, Louis GILLIAM, utilizing (412) 215-9779, contacted John SABAN, utilizing (412) 973-9298. During this conversation, Louis GILLIAM complained to SABAN that he had received low quality cocaine from SABAN. SABAN responded by saying "This next time when, when he come around I'll, I'll I'll pluck something like. You know what I mean?" and "Alright I'll, I'll, I'll pluck this time. I'll pluck this time. So we don't, so we don't have to be so big next time. I'll pluck this time." Thereby, indicating that he (SABAN) would "pluck" out the best quality cocaine for Louis GILLIAM before he distributed the rest of the cocaine to his other customers.

* * * * *

42. On February 14, 2012, at approximately 10:05 AM, Louis GILLIAM, utilizing (412) 215-9779, placed an outgoing call to First Name Unknown (FNU) Last Name Unknown (LNU) AKA "Pooh", utilizing telephone number (412) 918-9277. During this phone call, Louis GILLIAM asked the UM if he was "Hittin home runs." Based on your affiant's training and experience, your affiant is aware that those who distribute controlled substances often must remedy complaints of low quality from those whom they distribute controlled substances. Your affiant believes that Louis GILLIAM distributed a portion of cocaine to FNU LNU AKA "Pooh" and, during the conversation set forth below, Louis GILLIAM was asking "Pooh" for his assessment as to the quality of the cocaine. Louis GILLIAM said "(sic) I'm just need (sic) some feedback, you know cause Old Boy, Old Boy out the way, Gualizzle called me and shit. Gualizzi." Your affiant believes that, based upon this statement, that Louis GILLIAM has had direct communication with Randee GILLIAM's cocaine Source-of-Supply. Louis GILLIAM also said "by-passed it, the Young Buck and the Wizard and the mafucker called the black man directly." Based upon conversations that have been previously intercepted over (412) 973-9298 (used by John SABAN) investigators have had unconfirmed indications that Randee GILLIAM may also be known as "The Wizard." Furthermore, the Consolidated

[9] ECF No. 83 Ex. G.
[10] ECF No. 83 Ex. H.

Lead Evaluation and Reporting System (CLEAR) reports that Dorian GILLIAM was born on April 15, 1982 (29 Years) and is much younger than Randee GILLIAM and Louis GILLIAM. Your affiant believes that "the young buck" is Dorian GILLIAM. Based on the context of the call, your affiant believes that Louis GILLIAM was talking about himself "the black man" in the third person. FNU LNU AKA "Pooh" said "I was gonna try to get in the gym either tomorrow or the day after, cause I'm a need to. Know what I mean?" Your affiant is aware, that John SABAN has used fitness terminology "I'm getting ready to hang out with my personal trainer" in reference to imminent drug transactions. Based on the context and content of the call detailed below, and further established by that fact that other members of the SUBJECTS (John SABAN) have used fitness terminology in reference to drug deals, you[r] affiant believes that FNU LNU AKA "Pooh" said "I was gonna try to get in the gym" as a way to communicate that he desired to purchase cocaine from Louis GILLIAM. The following is an excerpt of this conversation:

Louis GILLIAM: Hittin home runs huh?

FNU LNU AKA "Pooh": Yeah.

Louis GILLIAM: Alright cool.

FNU LNU AKA "Pooh": Yeah.

Louis GILLIAM: Yeah, I'm no, I'm just need some feedback, you know cause Old Boy, Old Boy out the way, Gualizzle called me and shit. Gualizzi.

FNU LNU AKA "Pooh": Ah huh.

Louis GILLIAM: He was talking bout this and that, I'm UI, I'll let you know tomorrow, cause he he little upset bout the fuck up. You know what I mean?

FNU LNU AKA "Pooh": Right, right.

Louis GILLIAM: Cause that made him look bad and shit, he like ah no no no, that ain't what I do.

FNU LNU AKA "Pooh": He gonna be sayin I don't get down like that.

Louis GILLIAM: Yeah yeah, you know he he (sic) done by-passed it, the Young Buck and the Wizard and the mafucker called the black man directly. You know?

FNU LNU AKA "Pooh": Huh.

Louis GILLIAM: Ah yeah nigga. Mm Hmmm.

FNU LNU AKA "Pooh": Ah that's what I'm talkin bout. Direct contact. Yes sir.

Louis GILLIAM: He say nigga holla at me, when you need me to, goin on vacation, he said Um mm. I said oh, ok.

FNU LNU AKA "Pooh": Oh, ok.

Louis GILLIAM: See yeah, he he he need to be doin what I ask him to do though. That's fuckin bullshit.

FNU LNU AKA "Pooh": Right.

Louis GILLIAM: So, it's all good.

FNU LNU AKA "Pooh": Yeah. I was just gonna holler at you to, and ask you ah, cause I was gonna try to get in the gym either tomorrow or the day after, cause I'm a need to. Know what I mean?

Louis GILLIAM: Ah yeah, it's all good dog. You know I gotta get this weight off me anyway.

FNU LNU AKA "Pooh": Right. I just wanted you to be prepared. You know.
Louis GILLIAM: Yeah yeah yeah yeah yeah yeah yeah. Right there. What he said!

* * * * *

49. On February 22, 2012, at approximately 2:19 PM, Louis GILLIAM, utilizing (412) 215-9779, placed an outgoing call to Courtney WALLACE, utilizing (412) 661-6410. During this conversation, Louis GILLIAM said "anybody call you about them hoagies?" WALLACE responded by saying "Naw nope, not yet." Louis GILLIAM then said "Alright, let me know." This investigation has determined that Courtney WALLACE and Kevin McKINZIE, under the direction of John SABAN, receive UPS parcels containing cocaine sent from Las Vegas, NV. Based on the totality of the circumstances detailed within this affidavit, and further considering the subordinate position held by WALLACE within the SABAN DTO, your affiant believes that "hoagies" is actually a cryptic reference to cocaine packages. Your affiant believes that Louis GILLIAM said, "anybody call you about them hoagies?" to ascertain whether John SABAN had directed WALLACE to receive a parcel containing cocaine. The following is a transcript of the conversation:

WALLACE: Hello?

Louis GILLIAM: What up big guy?

WALLACE: What's going on?

Louis GILLIAM: Nothing much, what yall doing?

WALLACE: Uhh I'm in the house by myself, she out. She out eating, uhh out Eat N Park with uhh, with Kia.

Louis GILLIAM: Oh okay. alright well uhh, I'll just catch up with yall in a little bit anybody uhh, anybody call you about them hoagies?

WALLACE: Naw nope, not yet.

Louis GILLIAM: Oh okay. Alright, let me know.

WALLACE: Okay.

Louis GILLIAM: Alright dog.

WALLACE: Alright.

Louis GILLIAM: Later.

(ECF No. 83 Ex. H.)

<u>The Interview</u>

On March 20, 2012, Yarnot and Yock interviewed Plaintiff regarding the events of March 16, 2012. Yarnot stated that the purpose of the meeting was "to have a discussion with him about the vehicle." (Yarnot Dep. 60:21-61:4.) <u>See also</u> ECF No. 85 Ex. D at 5 ("Yock advised [Plaintiff that] Security was not interested in his criminal case, but rather the Verizon vehicle and its whereabouts on Friday.") Plaintiff, Yarnot, Yock and a representative of Plaintiff's Union, Kevin Wire, were present at the interview. (Yarnot Dep. 61:5-9.) Wire has been a Union representative for 15 years for Plaintiff's Union, and Vice President of Unit 44 for 10 years. (Wire Dep. 13:1-15:12).[11] In March 2012, Wire was Vice President of Unit 44 and Local 13,000 of Communications Workers of America; each covered Plaintiff at that time. (<u>Id.</u>)

─────────────────────

[11] ECF No. 85 Ex. B.

During the interview, Plaintiff challenged Security's involvement. Yarnot testified:

> We were trying to explain to him it was relevant that security was involved because of the fact that he took a company – a marked company vehicle, without authorization from any supervisors, and he was gone for several hours and nobody knew where he was, and he wasn't providing us with any real contact so we could try to find him and get the vehicle back. And at that point, that was our main concern.

(Yarnot Dep. 61:23-62:6.)

Plaintiff testified that the following incident occurred at the interview:

> [Yock] slammed down the stack of papers… He pointed to a section in the code of conduct and he started to speak…
>
> Once [Yock] pointed down to the code of conduct section about protecting Verizon's reputation or something of that nature, I looked down, and he started to speak. As soon as he started to speak, I looked back up at him. He says don't you [fucking] look at me.
>
> * * * * *
>
> And I said to him who you talking to like that and what's your problem? At that point [Yarnot] pushed away from the table and put his hand up on [Yock] and said come on, man, and he started to push [Yock] – and [Yock] resisted.
>
> [Yock] looked at me with such a high level of disdain. The way I describe it is you being a father and walking into a room and catching your sixteen year-old daughter in bed with a boy. I couldn't understand it.
>
> [Yarnot]'s a pretty big guy and [Yock] was resisting [Yarnot], and [Yarnot] was trying to push him towards the door, and before I knew it [Yock] screamed out and called me a fucking felon, and at that point I jumped up from the table.
>
> Kevin Wire grabbed me, and [Yarnot] pushed John Yock out the room.

(Gilliam Dep. Vol. I, 114:7-115:17). Plaintiff testified that, since he has no felony criminal background, he believed that Yock had substituted the word "felon" for something else and that it was racial in nature. (Id. at 120:5-16.)

Wire also testified that John Yock slammed the Code of Conduct down in front of

Plaintiff on the table. (Wire Dep. 30:23-31:2). Then:

> [Plaintiff] looked up at him, I know, and he said to him, quit fucking looking at me, John Yock said. And with that, you could see, he was up, [Plaintiff] said, what is your problem or what is your effing problem or fuckin' problem, I can't remember. I'm not sure. And John Yock looked at him and said fuckin felon. And with that, [Plaintiff] jumped up. I jumped up. I grabbed [Plaintiff]. Brennan grabbed [Yock], dragged him out of the room.
>
> And we are sitting there, and … it blew my mind. I was like, wow, this is so unprofessional. I mean, I've never dealt with anything like that before.
>
> ****
>
> About, I bet you about 10 minutes passed, I guess, Brennan came back in and [Yock] came in another door and he sat way down at the end of the table. And Brennan, I said, what was that all about. And he said, what? I said, he called him a fuckin felon. He said, I didn't hear that. I said, that's bullshit. I know you heard it. He said, no, I didn't hear it. I said, okay.

(Wire Dep. 31:4-14, 19-25.)

Wire stated that Verizon security "treated [Plaintiff] differently than I've seen anybody treated. Like he was already guilty, is what I took from that. They had him guilty already." (Wire Dep. 26:21-24). It appeared to Wire as though Yarnot and Yock were "playing good cop, bad cop" during the interview. (Id. at 37:12-16). Wire was "taken aback" by the way Verizon Security treated Plaintiff during the March 20, 2012 interview. (Id. at 27:10-11). According to Wire, Verizon Security represented that they had a criminal complaint and wiretap records and were asking Plaintiff about certain information set forth therein. (Id. at 27:12-15). Plaintiff advised Verizon Security that he was not involved in the activity alleged in the criminal complaint, but according to Wire, they refused to believe him. (Id. at 27:19-22.)[12]

Defendant states that, according to Plaintiff, Yock's alleged March 20, 2012 comments

---

[12] Defendant attempts to discredit Wire's testimony by contending that it is his job to advocate for bargaining unit members. (Wire Dep. 16:5-7) (ECF No. 87 Ex. 1.) However, Wire testified that he does not assist unit members in filing discrimination complaints. (Id. at 16:11-17.) Moreover, it is the responsibility of the trier of fact to assess witnesses' credibility.

are the sole contact for his claim that Yock discriminated against him:

> Q: Let's go back. Other than John Yock making the comments to you in the
> March 20 interview you've already told me above, any other contact by Mr. Yock
> that supports your claim that you think he discriminated against you on the basis
> of your race?

> A: No.

(Gilliam Dep. Vol. I, 133:25-134:6.)[13]  Plaintiff responds that Defendant attempts to construe

this as a legal conclusion made by a lay person.

During the recess at the March 20, 2012 interview when Yarnot pulled Yock out of the

room, Plaintiff and Wire met with Plaintiff's manager, Patrick Flood, who was present in the

building but not in the interview room at the time of the alleged incident with Yock.  (Gilliam

Dep. Vol. I, 116:16-23, 124:12-22.)  According to Plaintiff, he reported the following to Flood:

> Q: And can you tell me everything you said to Pat Flood that you think constitutes
> a complaint about Mr. Yock. What did you say to Mr. Flood?

> A: I told Pat that he slammed the papers down in front of me and he leaned
> forward real aggressively and directed my eyes to a section of the code of conduct
> and started speaking.

> Once he started speaking, I redirected my eyes up towards him because he was
> speaking to me, and that irritated him. He told me not to fucking look at him.

> Q: Okay.

> A: And I told him – then he had to be physically removed from the room by the
> other security officer, and he called me a fucking felon.

> Q: Anything else?

> A: I said that's a direct violation of the code of conduct, and I wanted him to
> know that.

> Q: Did you say anything else to Mr. Flood?

---

[13] Defendant also contends that Plaintiff admitted that he had no problem with Yarnot's conduct
during the interview.  (Id. at 122:21-123:3.)  This is misleading, as he testified that Yarnot's
discrimination took the form of covering up Yock's conduct.  (Id. at 133:5-11, 134:12-14.)

A: No.

(Gilliam Dep. Vol. I, 124:23-125:18.)[14]  Wire testified that he also reported Yock's behavior to

Flood during the break.  (Wire Dep. 38:18-20.)

Wire testified as follows:

Q. Is there any particular reason that you thought they treated him differently?

A. Yes, I think they thought that he did do – he was in on the cocaine deal. absolutely think that they thought that.

Q. So, you think it had to do with the criminal charges facing Mr. Gilliam?

A. I think so. After it was over I told [Plaintiff], I said, you might want to file a Complaint. I'm the one that told him to do it. Just because it just seemed like it was out of line. Everything was out of line in this whole thing. And I guess this is what I'm here for today, because I didn't know anything about it.

Q. So, when you say you told him that you might want to file a Complaint, what were you talking about?

A. Through Verizon calling the human resource, the equal employment. I said, it seems like they were picking on you.

Q. Do you believe that Mr. Yock used any language or made any comments that were motivated by race?

A. Wow. I'm going to say, yes. And you had to be there. It was just, it was bizarre how it went down. That is why I told him to go through the EEO because of what John Yock said to him.

Q. So, what did he say -- what did John Yock say that you believe was motivated by race?

A. It was the whole thing, him slamming it down, him treating him like a convict. And I think if it was anybody -- I don't know. It's my own opinion. But I think if it was anybody else he wouldn't have done it. I really don't think so.

---

[14] Defendant contends that Plaintiff made no claim to Flood about race discrimination by Yock or any other person.  However, the deposition excerpt it cites in support of this statement is not in the record.  More importantly, as Plaintiff notes, he reported what Yock said, but whether this constituted "race discrimination" is a legal conclusion.

Q. Why do you say that?

A. Because I knew John. And I never had a problem with him. I just, you know, always said, hi. I don't know if he snapped. I don't know what it was. But it seemed like they already had the information from the DEA. They already had him proven guilty. And, to me, my own opinion, I think it was because he was black. And I don't have anything to say other than that. I mean, it is -- you had to be there. It was bizarre, it really was.

(Wire Dep. 33:15-35:5.)

Defendant contends that Wire was pointing to Plaintiff's reaction to being accused of drug charges, rather than acts of racial discrimination. However, this question was actually posed to Wire at his deposition:

Q. So, did his concerns, in your opinion, seem more focused on what he perceived to be false allegations about drug use or drug activity?

A. Yes, yes.

Q. More so than any sort of discrimination?

A. No, I wouldn't say that.

Q. Why is that?

A. Like I said, you had to be there. But the whole thing, they just, like, talked down to him the whole time. And, I mean, I've been around a long time and I've seen a lot, but that was the first time I've ever seen somebody actually from the company doing something that stupid. And that is what –

Q. What did you think was stupid?

A. Him calling him a fuckin felon.

Q. So, it was the profanity?

A. It was that. It was the whole thing. John Yock, I don't know what his deal was. I don't know if he was having a bad day. I don't know. But, to me, it seemed like he talked down to him, which I took as being racist and being a convict already. They had him convicted and put in jail. I mean, it was bad.

(Wire Dep. 49:4-25.)

14

Yarnot prepared a Memorandum of Interview documenting the March 20, 2012 interview of Plaintiff. In the Memorandum of Interview, Yarnot made no mention of either the profanity that Yock used or that Yock, Plaintiff and Wire raised their voices during the March 20, 2012 interview. (ECF No. 83 Ex. F at P 0048-49.) Yarnot also completed an Investigative Report, which similarly made no mention of the heated exchange. (Id. at P 0050.) Plaintiff notes that Verizon never conducted any investigation into his report of Yock's comments. (Crompton Dep. 35:1-3.)[15]

Defendant contends that, after the interview, Yock had no further role in Verizon's investigation. (Yarnot Dep. 90:18-23.) Plaintiff responds that Yock's timesheet indicates that he worked over 16 hours on the investigation. (ECF No. 85 Ex. O.)

Defendant states that the criminal complaint and the DEA affidavit were sealed from March 18, 2012 to March 22, 2012, and, therefore, not publicly accessible at the time of the March 20, 2012 interview. U.S.A. v. Gilliam, No. 2:12-mj-00207, ECF Nos. 3 and 4 (Mar. 18, 2012). (Motion to Seal and Order granting same) and ECF Nos. 9 and 10 (Mar. 22, 2012) (Motion to Seal and Order granting same). Defendant states that, on March 23, 2012 – three days after interviewing Plaintiff – Yarnot learned that the criminal complaint and the affidavit had been unsealed and, for the first time, reviewed the above excerpts from the DEA affidavit. (Yarnot Dep. 59:11-60:16; 84:10-13 ("Q: The criminal complaint that you saw on March 23, 2012, was that the first time you saw it? A: To the best of my recollection, yes."). See ECF No. 83 Ex. I (motion to unseal criminal complaint and order granting same).

Plaintiff contends that Yarnot stated that he had access to the criminal complaint and wiretap records and was asking Plaintiff about these documents. (Wire Dep. 27:12-15. See also

---

[15] ECF No. 85 Ex. E.

id. at 26:13-17 ("they said that he was conspiring to distribute five kilos of cocaine…. And they had … phone records. I mean, they had all kinds of stuff.") The Memorandum of Interview explicitly states that Security "wanted to confirm [Plaintiff] was charged by the … DEA. Security advised [Plaintiff] it had been made aware by the DEA he was facing a felony charge of possession with intent to distribute five [kilos] of cocaine and asked him if that was accurate." (ECF No. 83 Ex. F at P 0048.)

Plaintiff notes that, according to Verizon's records, following his interview of March 20, 2012, the Company marked the case closed:

> Security provided an update to [Labor Relations employee James] McGovern. He advised apparently Gilliam's Director, Frank Mattera, spoke to Labor Relations Director Mary Ann [sic] Crompton regarding this matter yesterday. Since Gilliam's actions were off company time and company property, no action will be taken at this time regarding his arrest. McGovern advised even under Verizon's drug policy, since there is no belief Gilliam is or was under the influence of illegal drugs, nothing can be done with this either. However, if Gilliam is ultimately convicted in court, he has 5 days to report to the company the fact that he was found guilty on drug related charges.
>
> ****
>
> Security asked McGovern about the issue involving the company van and McGovern advised Crompton said it was not a termination type offense, and Gilliam did say he was scared.
>
> Based on the current decision from Labor Relations and or local Management, Security is forwarding this case for closure with a final disposition of "None."

(ECF No. 85 Ex. D at 7-8.)[16]

---

[16] Defendant contends that this exhibit is not an "Investigation Report" as Plaintiff refers to it, but an email from Yarnot to Cheoma Smith in response to her March 21, 2013 email. Smith is identified in the document as an EEO investigator and the email begins with Yarnot's statement that it represents "the complete narrative from my case file." (Id. at 2.) Defendant does not argue that the exhibit is inadmissible or that the facts listed in it are untrue and therefore it will be considered. Ironically, Defendant also argues that neither Crompton nor Mattera relied on the document in making the decision to terminate Plaintiff's employment, when it is clear that the document represents a summary of events that led to their decision.

<u>Plaintiff is Suspended</u>

On March 23, 2012, Verizon suspended Plaintiff without pay.  (ECF No. 85 Ex. D at 9.)
The suspension occurred after Yarnot read an article in the Pittsburgh Post-Gazette that
described a drug arrest but did not mention Plaintiff at all.  Yarnot then looked at the unsealed
criminal complaint and concluded that Plaintiff was involved in drug activity.  Yarnot verified
that Plaintiff was working for Verizon at the time of the February 14, 2012 and February 22,
2012 phone calls described in the DEA affidavit, and that the February 2, 2012 phone call
reportedly occurred just four minutes after the scheduled end of Plaintiff's tour that day. (Yarnot
Dep. 80:7-20.)

Yarnot notified James McGovern, who asked Crompton "Does this give us anything to
support taking any action?" She responded "Yes, suspend, pending further investigation.  If they
can suspend today, to it.  I want to be safe [sic] than sorry."  (ECF No. 85 Ex. H.)  Mattera
testified that the decision to suspend Plaintiff was based on the conclusion that he was involved
in the sale of drugs, information he was told by Verizon Security, and that prior to receiving such
information he never considered suspending him.  (Mattera Dep. 20:7-17.)[17]

<u>Internal Discussions Between Labor and Security</u>

According to Yarnot's narrative, on April 12, 2012, Plaintiff called him to ask for an
update on his case.  "Security advised unless his attorney and or the federal courts can provide
documents [that] the charges against him are or will be dropped, there is nothing that can be done
at this time."  (ECF No. 85 Ex. D at 9.)

On April 13, 2012, a telephone conference was convened involving Yarnot, McGovern,
Crompton, Paul Loconte of Labor Relations and a Security Manager named Chuck Snyder.

---

[17] ECF No. 85 Ex. F.

Crompton asked Verizon Security if it could confirm that Plaintiff had direct involvement in criminal activity and Security responded that, based on the allegations in the criminal complaint and the affidavit, it concluded that Plaintiff had direct involvement in drug activity. (ECF No. 85 Ex. D at 10.)

Second Interview

On April 16, 2012, Yarnot asked Plaintiff to attend a second interview to discuss the criminal complaint and the allegations in the DEA affidavit. (Yarnot Decl. ¶ 3[18]; Gilliam Dep. Vol. I, 147:11-16.) On April 17, 2012, Yarnot again asked Plaintiff to attend an interview. (Yarnot Decl. ¶ 5.)

Yarnot states that, on both of these occasions, Plaintiff did not agree to submit to an interview. (Yarnot Decl. ¶¶ 4, 6.) Yarnot's summary states that Plaintiff indicated that, based on the advice of his lawyers, he could not discuss the specifics of his case. Plaintiff also notified Yarnot that an indictment had been released and his name was not on it. In response:

> Security advised while it appreciates the fact that he is not [listed] on the indictment, he is still charged and was asked if his legal team could advise if the charges against him would be dropped or withdrawn…. Security advised unless there was some records from the court stating the charges were being withdrawn or otherwise vacated, there not much else that could be done at this time.

(ECF No. 85 Ex. D at 11.) See also id. (Loconte, upon being advised that Plaintiff's name was not on the indictment, similarly responded that "the fact remains that [Plaintiff] was charged and currently there is sufficient evidence to show he had involvement with illegal drug activity.")

Plaintiff states that he never refused to submit to a second interview. Rather, he asked if he could bring his attorney with him; that he attempted to contact his attorney but was unable to do so; and that Yarnot said not to bother because "we're going to go ahead and wrap the

---

[18] ECF No. 83 Ex. J.

investigation up, and you should be hearing some word from management about the status."
(Arb. Hr'g at 106:7-108:25.)  Wire testified that he never had to deal with a request for a second
interview by Verizon and that he did not believe Plaintiff had an obligation to go back because
"they should have asked all their questions when they were there."  (Wire Dep. 42:10-13, 15-17.)
The arbitration panel noted that, at the hearing, Yarnot testified that he has never permitted an
attorney to be present during an employee's security interview and he would not have allowed
Plaintiff's attorney to attend.  (Arb. Op. & Award at 5.)[19]

Plaintiff also points to evidence in the record that he contacted Verizon to keep the
Company informed about developments regarding his criminal case.  (Yock Dep. 50:22-51:2;
ECF No. 85 Ex. D at 9-11; Arb. Op. & Award at 5 (Yarnot "agreed that Mr. Gilliam contacted
him more than once to keep him informed and to ask him about the status of his case.")

<u>Plaintiff's Employment is Terminated</u>

On April 20, 2012, Plaintiff's employment with Verizon was terminated.  Defendant
states that Mattera and Director of Labor Relations Maryanne Crompton made the decision to
terminate Plaintiff's employment. (Crompton Decl. ¶¶ 1-2[20]; Mattera Decl. ¶ 4.)  Plaintiff notes
that in her deposition, Crompton testified that she alone made the decision.  (Crompton Dep.
30:20-22.)[21]  The termination letter was signed by Mattera.  Plaintiff's April 20, 2012
termination notice letter provided the following reasons for his discharge: (1) "Improper/
unauthorized utilization of the Company's motor vehicle"; (2) "Involvement in the sale or
transfer of illegal drugs"; and (3) "Failure to cooperate with the company's investigation."
(Mattera Decl. Ex. A.)  Crompton states that she did not know Plaintiff's race or that Plaintiff

---

[19] ECF No. 85 Ex. L.
[20] ECF No. 83 Ex. K.
[21] ECF No. 85 Ex. E.

had complained about Yock at the time of the decision to terminate Plaintiff's employment. (Crompton Decl. ¶¶ 3-4.) Mattera also states that he did not know of Plaintiff's race or that Plaintiff had complained about Yock at the time of the decision to terminate Plaintiff's employment. (Mattera Decl. ¶¶ 5-6.)

Defendant states that Yarnot did not participate in the decision to terminate Plaintiff's employment. (Yarnot Dep. 93:2-4 ("Q: Did security have any input in the decision to terminate Mr. Gilliam? A: No."). Defendant contends that Yock did not participate in the decision to terminate Plaintiff's employment. (Yock Dep. 48:2-3 ("Q: And how about [the decision] to terminate [Mr. Gilliam]? A: No, sir."). Plaintiff responds that Crompton testified that she relied upon the information provided by Verizon security, namely Yarnot and Yock. (Crompton Dep. 24:11-16, 28:15-23, 30:20-22, 36:3-5.)[22]

Defendant states that Plaintiff testified that there were only two reasons for his discharge:

Q: Do you think the fact that you were accused of a crime in a probable cause affidavit is the reason you were fired?

A: Partly.

Q: You said partly. What were the other reasons?

A: I believe it was a cover-up because of the allegations I made about Mr. Yock when I told about his behavior to Pat Flood.

Q: So the charges in the probable cause affidavit you think are one of the reasons you were fired. Right?

A: Yes.

Q: And the fact that you complained to Flood about Yock you think is another reason you were fired. Right?

A: Yes.

---

[22] Defendant denies this statement, but it is supported by the record.

Q: Are there any other reasons you think you were fired?

A: No.

(Gilliam Dep. Vol. I, 160:19-161:12.)[23]  After his termination, in the summer of 2012, Plaintiff

submitted a "director level grievance" to Mattera about Yock's conduct.  (Id. at 128:12-21.)

Further Developments

Plaintiff's Union filed a labor grievance on his behalf regarding the termination of

his employment.  (Crompton Decl. ¶ 5.)  As the labor grievance concerning Plaintiff's discharge

was pending, the U.S. Government dismissed the criminal complaint against Plaintiff on

December 11, 2013.  U.S.A. v. Gilliam, No. 2:12-mj-00207, ECF Nos. 65, 66 (Dec. 11, 2013).[24]

The grievance and arbitration process concerning Plaintiff's grievance was governed by the labor

agreement between Verizon and the Union. (Crompton Decl. ¶ 6.)  Defendant contends that

Plaintiff had no right to reinstatement under the governing labor agreement absent an arbitration

award ordering reinstatement. (Crompton Decl. ¶ 7.)[25]

After he was terminated and before he was reinstated, Plaintiff worked for the Post

Office.  (Gilliam Dep. Vol. I, 173:18-21.)[26]

Plaintiff states that Yarnot continued to check court records and learned that the criminal

complaint had been dismissed, but took no action to inform the Company.  (Arb. Hr'g at 62.)  He

also contends that Labor Relations was aware that the criminal complaint had been dismissed but

---

[23] Defendant's statement that neither of these reasons was race discrimination is a legal conclusion.

[24] ECF No. 83 Ex. M.

[25] It also states that Plaintiff did not file a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) regarding Verizon's failure to reinstate his employment. (Gilliam Dep. Vol. II, 246:16-19) (ECF No. 83 Ex. A-2). However, as explained below, this Court has already held that he was not required to do so, and therefore this point is not material for purposes of this case.

[26] ECF No. 85 Ex. M.  Defendant contends that this fact is immaterial.

took no action to reinstate him.  (Crompton Dep. 49:16-22, 53:3-5.)[27]

<u>The Arbitration Award</u>

On August 7, 2014, a hearing was held on Plaintiff's arbitration.  On November 14, 2014, the arbitration panel entered an award in Plaintiff's favor.  The panel concluded that the allegations against him relied on questionable evidence, the DEA Agent who made them was never questioned about them and the charges were ultimately dismissed.  (Arb. Op. & Award at 9.)  The panel noted that Plaintiff was only <u>described</u> as having complained about the quality of his cocaine in the February 2, 2012 telephone call; there was no indication from either party that drugs were the subject of the conversation.  (<u>Id.</u> at 10.)  In the other two conversations, the DEA Agent asserts that references to "going to the gym" meant "imminent drug transactions" and that a reference to "hoagies" meant "packages of cocaine."  As the arbitrators noted "The conversations Mr. Gilliam admits to having may be 'cryptic' but so are many overheard conversations of unknown people, especially when they are speaking in an unfamiliar vernacular.  The Affidavit does not explain how Mr. Gilliam was involved in the alleged conspiracy."  (<u>Id.</u> at 11.)

The panel awarded Plaintiff reinstatement of his employment with full back pay, "less interim earnings or unemployment compensation," and benefits, as well "bridged" service credit for the entire back pay period. (Arb. Op. & Award at 14; see also Crompton Decl. ¶ 8.)  Defendant states that, in accordance with the arbitrator's award, Verizon reinstated Plaintiff's

---

[27] Defendant observes that Yarnot and Crompton did not testify when they learned this information.  Nevertheless, Defendant does not deny that it was aware of this fact and the record establishes that Defendant learned of it no later than January 10, 2014, when Plaintiff stated it in his Amended Complaint.  (Am. Compl. ¶ 21 & n.3.)  Thus, the record is undisputed that Defendant was aware that the charges were dismissed long before the arbitration hearing and award, but that it took no action to reinstate Plaintiff's employment.

employment on December 1, 2014, and paid him back pay in the amount of $136,845.11, along with corresponding contributions to his 401(k) account, covering the discharge period. (Crompton Decl. ¶ 9.) However, Plaintiff contends that Verizon did not calculate the back pay properly. (Gilliam Dep. Vol. III, 32:3-18.)[28]

Plaintiff testified that, since the reinstatement of his employment, he has been happy working at Verizon and has not searched for employment with another employer. (Gilliam Dep. Vol. I, 209:12-14, 209:20-21 ("Q: Are you looking for any jobs outside of Verizon? A: No. * * * * * Q: Are you happy with your job at Verizon? A: Yes."). However, Crompton admitted that Verizon offered Plaintiff an incentive package to retire after he was reinstated because "we still had strong reservations about Mr. Gilliam … [t]hat he was involved with, you know, the drug activity." (Crompton Dep. 53:1-5.)

Procedural History

Plaintiff filed his EEOC charge on March 11, 2013. (Am. Compl. Ex. E.)[29] He received a Notice of Right to Sue from the EEOC on July 25, 2013. (Sec. Am. Compl. ¶ 2(f).) Plaintiff filed his original Complaint on October 23, 2013 (ECF No. 1). On December 23, 2013, Defendant filed a motion to dismiss (ECF No. 8). In response, on January 10, 2014, Plaintiff filed an Amended Complaint (ECF No. 14), which eliminated the claims in Count III and addressed the technical failure which led to the Complaint being docketed as filed on October 25, 2013, to address the issue Defendant raised in its first motion to dismiss that he filed the case two days beyond the 90-day statute of limitations.

On January 27, 2014, Defendant filed a motion to dismiss the Amended Complaint (ECF

---

[28] ECF No. 85 Ex. N.
[29] Wire testified that he encouraged Plaintiff to file a charge of racial discrimination. (Wire Dep. 33:22-25, 38:5-8.)

No. 17), again arguing that it was untimely because it had not been filed within 90 days of Plaintiff's receipt of the Right-to-Sue Letter from the EEOC. Plaintiff filed a brief in opposition on February 10, 2014 (ECF No. 19). Defendant filed a reply brief on February 24, 2014 (ECF No. 20). On March 7, 2014, a Memorandum Opinion and Order was entered (ECF No. 25), which denied the motion to dismiss.

On March 21, 2014, Defendant filed an answer to the Amended Complaint (ECF No. 27) and the parties engaged in a mediation, which was unsuccessful. However, the parties indicated that an arbitration was being conducted (as noted above) and the case was stayed at that time. On December 10, 2014, the parties reported the results of the arbitration and the matter was again sent to mediation on the remaining issues (ECF No. 35). The second attempt at mediation was also unsuccessful. See ECF No. 38.

On April 20, 2015, Plaintiff filed a motion for leave to file a Second Amended Complaint (ECF No. 41), which Defendant opposed (ECF No. 43). On April 29, 2015, an order was entered granting Plaintiff's motion (ECF No. 44) and the Second Amended Complaint was filed that same day (ECF No. 45). Count I alleges racial discrimination with respect to the acts leading up to Plaintiff's termination. Count II alleges racial discrimination arising out of Defendant's failure to reinstate Plaintiff after the criminal charges had been dismissed. Count III alleges retaliation with respect to Plaintiff's opposition to racial comments and behavior by Mr. Yock. Count IV alleges retaliation with respect to Defendant's failure to reinstate Plaintiff after the criminal charges had been dismissed.

On May 14, 2015, Defendant filed a partial motion to dismiss Counts II, III and IV of the Second Amended Complaint (ECF No. 50).[30] Plaintiff filed a brief in opposition on May 21,

---

[30] Defendant filed an Answer with respect to Count I. (ECF No. 49.)

2015 (ECF No. 52) and Defendant filed a reply brief on June 12, 2015 (ECF No. 54). On June

17, 2015, Plaintiff filed a sur-reply brief (ECF No. 55). On June 18, 2015, a Memorandum

Opinion and Order was entered, denying the motion to dismiss (ECF No. 56).

On February 15, 2016, Defendant filed a motion for summary judgment (ECF No. 80).

Plaintiff filed a brief in opposition on March 15, 2016 (ECF No. 86) and Defendant filed a reply

brief on March 31, 2016 (ECF No. 87). On April 8, 2016, Defendant filed a motion for oral

argument on the motion for summary judgment (ECF No. 89). The Court has concluded that the

matter can be decided on the briefs and oral argument is not necessary. Therefore, the motion for

oral argument will be denied.

Standard of Review

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide

that: "The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts

sufficient to establish the existence of any element essential to that party's case, and for which

that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986). The moving party bears the initial burden of identifying evidence which demonstrates

the absence of a genuine issue of material fact. Once that burden has been met, the non moving

party must set forth "specific facts showing that there is a genuine issue for trial" or the factual

record will be taken as presented by the moving party and judgment will be entered as a matter

of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An

issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 266 (3d Cir. 2005); Doe v. County of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

Defendant argues that: 1) Plaintiff cannot state a prima facie case of racial discrimination with respect to his termination because it was based on the charges filed against him, the Verizon investigator (Yock) who swore at him (not even using racially derogatory language) had no involvement in this discharge and conversely the management officials who made the decision (Crompton and Mattera) had no knowledge of his race and even if he could state a prima facie case, Verizon had proffered legitimate non-discriminatory reasons and he offers no evidence of pretext; 2) the retaliation claim fails because he engaged in no protected conduct, he points to no similarly situated employees who received better treatment and the decision makers did not know his race; and 3) he cannot maintain a claim that he was not reinstated after the criminal charges were withdrawn because he never filed an EEOC charge with respect to this claim, he never requested reinstatement and, pursuant to the collective bargaining agreement that governed the arbitration, Verizon was under no obligation to reinstate him until the arbitration panel directed it to do so (and when this occurred, the Company complied).

Plaintiff responds that: 1) pursuant to the "cat's paw" theory, management can be held liable for relying on the racially biased information it received from Verizon security; 2) he does not need to refer to comparators, but can also maintain a claim based on Yock's comments, the fact that failing to return to vehicle was not a termination type offense, the matter was closed but then strangely reopened after Verizon Security read a newspaper article that did not even refer to him, accessed the criminal complaint and affidavit and independently concluded that he was

26

guilty; 3) he has evidence of pretext as to each of the three proffered reasons – failure to return the vehicle was not a termination type offense, he was not reinstated once the drug charges were dismissed and the second interview was unprecedented and he kept Verizon apprised of all developments, so he did cooperate in the investigation; 4) as to the retaliation claim, he complained about Yock's comments but nothing was done, then Verizon security reopened the case and fired him based on false information about drugs being found in his home and Labor Relations maintained its stance even after the charges were dismissed.

In its reply brief, Defendant argues that: 1) the cat's paw theory does not apply because Yock's comments were not racial in nature and his involvement was limited to the interview, Yarnot's role was limited to the interview and not telling Labor Relations that the charges were dismissed and the only thing Yarnot provided to management was the criminal complaint upon which they relied; 2) Plaintiff tries to attack each reason individually but Verizon relied on all three and even if it was wrong about the drug charges, that does not constitute evidence of pretext; 3) Plaintiff misrepresents the facts in that Yarnot reopened the investigation after the DEA affidavit was unsealed, and he was not entitled to reinstatement after the charges were dismissed when the reasons were broader than the charges and there was a pending arbitration about the matter; 4) he cannot raise the March 23, 2012 suspension as a claim because it is not mentioned in the Second Amended Complaint and it would fail for the same reasons as the termination claim; and 5) he cannot raise failure to reinstate as a separate claim because he did not exhaust it at the EEOC, and in any event it would fail for lack of temporal proximity, nor can he raise a claim of "continued investigation" for the reasons identified.

<u>Counts I-II: Racial Discrimination Claims</u>

Title VII provides that it is an unlawful employment practice for an employer to

discriminate against an individual with respect to conditions of employment because of her race or gender. 42 U.S.C. § 2000e-2(a). In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of discrimination indirectly following the shifting burden analysis set forth by the Supreme Court in <u>McDonnell Douglas v. Green</u>, 411 U.S. 792, 802 (1973) and refined in <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 252 53 (1981). <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 278-79 (3d Cir. 2000).

> As the Court of Appeals for the Third Circuit has stated:

> The existence of a prima facie case of employment discrimination is a question of law that must be decided by the Court. It requires a showing that: (1) the plaintiff belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action...

<u>Sarullo v. U.S. Postal Serv.</u>, 352 F.3d 789, 797 (3d Cir. 2003) (footnote and citations omitted).[31]

> If the employee presents a prima facie case of discrimination, the employer must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." <u>McDonnell Douglas</u>, 411 U.S. at 802. If the employer specifies a reason for its action, the employee must have an opportunity to prove the employer's reason for the adverse employment action was a pretext for unlawful discrimination. <u>Id.</u> at 804. The Court of Appeals for the Third Circuit has stated that:

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder to reasonably infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).

<u>Fuentes v. Perskie</u>, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

---

[31] Defendant argues that Plaintiff has failed to point to other similarly situated employees outside his protected class who were more favorably treated, but the court in <u>Sarullo</u> explicitly rejected the argument that a prima facie case requires this element. 352 F.3d at 797 n.7.

Exhaustion of Administrative Remedies

The Court of Appeals has explained that:

> A plaintiff "must exhaust all required administrative remedies before bringing a claim for judicial relief." Robinson v. Dalton, 107 F.3d 1018, 1020 (3d Cir. 1997). To bring a claim under Title VII, a plaintiff must file a charge of discrimination with the EEOC and procure a notice of the right to sue. See id. at 1020-21…. "[T]he parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination, including new acts which occurred during the pendency of proceedings before the [EEOC]." Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398-99 (3d Cir. 1976) (citations omitted). A plaintiff's claim must thus fall "fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996).

Mandel v. M & Q Packaging Corp., 706 F.3d 157, 163 (3d Cir. 2013).

The law of the case "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. This rule of practice promotes and efficiency of the judicial process by protecting against the agitation of settled issues." Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988) (citations omitted). This Court has already held that Plaintiff did not have to file a second charge of discrimination with the EEOC regarding Defendant's failure to reinstate him once the criminal complaint was dismissed because it was all part of the same adverse employment action (ECF No. 56 at 10-11), and that is the law of this case. See also Sarullo, 352 F.3d at 798 (employee "suffered an adverse employment action when he was terminated and not rehired.") (emphasis added). Therefore, this argument is rejected.

With respect to the arguments concerning the "continued investigation" and the suspension, these are also rejected. Plaintiff's EEOC charge explicitly stated that "or on about March 23, 2012, I was suspended without pay, pending further investigation." (Am. Compl.

¶ 2(e) & Ex. E.)[32]  Moreover, as the facts of this case have developed, it has become clear that Verizon closed the investigation on March 20, 2012, but then reopened it on March 23, 2012 and suspended Plaintiff that same day, and thus the "continued investigation" is not a separate claim but part of the case.

Cat's Paw Theory

Plaintiff contends that his claims are not foreclosed because Yock and Yarnot were not the officials at Verizon who formally made the decision to terminate him.  In Staub v. Proctor Hospital, 562 U.S. 411 (2011), a case brought under the Uniformed Services Employment and Reemployment Act of 1994 (USERRA), the Supreme Court held that, "if a supervisor performs an acts motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA."  Id. at 422 (footnotes omitted).  Such a situation invokes the "cat's paw" theory of liability, based upon Aesop's fable of the monkey who induces a cat by flattery to extract roasting chestnuts from the fire, and the cat does so, burning its paws in the process and the monkey makes off with the chestnuts and leaves the cat with nothing.  Id. at 415 n.1.  The Court of Appeals has applied this reasoning to cases under Title VII, McKenna v. City of Philadelphia, 649 F.3d 171 (3d Cir. 2011).

Thus, the fact that Crompton and Mattera were the ultimate decision makers does not preclude Verizon for being held liable for the actions of Yock and Yarnot if they were the proximate cause of Plaintiff's termination.  Contrary to Defendant's contention, there is sufficient evidence here to establish proximate cause: Yock's behavior at the interview led both Plaintiff and Wire to conclude that he was treating Plaintiff in a racially discriminatory manner

---

[32] The Federal Rules of Civil Procedure allow for amendment of pleadings at trial to conform to the evidence.  Fed.R.Civ.P. 15(b)(1).

and they immediately reported this to Flood; Yarnot denied hearing Yock's comments and did not put them in his report and Plaintiff's complaint against Yock was never investigated; Yarnot requested that Plaintiff come to a second interview (despite the facts that he had already participated in one interview in which he denied that he was involved in drug activity, he had already been suspended, this was unprecedented and he called Verizon Security multiple times and kept them apprised of the status of his criminal proceedings) and used his request to bring a lawyer with him as evidence that he was "refusing" to cooperate with Verizon's investigation; Security concluded that Plaintiff was directly involved in drug activity based solely upon allegations made in the criminal complaint and the affidavit and reported this information to Crompton, who used it to justify Plaintiff's termination even though they were only allegations from a criminal complaint that was dismissed (and Plaintiff had reported that he was not named in the indictment but Verizon responded that this fact did not matter because he was "still charged").[33]

Moreover, even without the cat's paw theory, Plaintiff has established a prima facie case of racial discrimination: he belongs to a protected class, he suffered an adverse employment action and he has pointed to circumstances that would support an inference of unlawful discrimination. As explained above, Defendant's argument that he has failed to point to comparators is a red herring, as that is not a necessary part of the prima facie case.

<u>Defendant's Proffered Reason and Plaintiff's Evidence of Pretext</u>

Defendant contends that Plaintiff was terminated for the three reasons outlined in the April 20, 2012 letter: his involvement in the sale or transfer of illegal drugs, his failure to

---

[33] It is noted that, although the termination letter to Plaintiff stated that he was interviewed by "the company" and that "the company" asked him to attend a second interview, Yarnot's summary states that "Security requested the references to 'Security' be changed to 'company.'" (ECF No. 85 Ex. D at 11.)

cooperate in Verizon's investigation and the misuse of the Company vehicle. Defendant has thus satisfied its relatively light burden of production. Krouse v. American Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997).

Plaintiff argues that these proffered reasons are a pretext for unlawful race discrimination and proceeds along "Fuentes prong one" by arguing that he has submitted evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate reason. Keller v. ORIX Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc).

Plaintiff has pointed to evidence that: 1) his failure to return the vehicle on time to its regular garage after his workday was not a termination type offense; 2) he did cooperate in Verizon's investigation by attending an interview (at which he was treated with animus that both he and Wire perceived as racially motivated), Verizon Security had already made an independent assessment based upon the criminal complaint and affidavit that he was guilty and he had been suspended, and he did not refuse to attend a second interview but merely asked if he could bring his attorney and rather than permit this, Verizon concluded that he was "refusing to cooperate"; and 3) Verizon had closed the investigation on March 20, 2012, but then reopened it on March 23, 2012 upon reading a newspaper article that made no mention of Plaintiff, accessed the criminal complaint and affidavit and made an independent assessment based upon these documents that he was guilty, he notified Verizon that he was not named in the indictment but Verizon took no interest because he was "still charged"; and 4) when the criminal complaint was dismissed, Verizon still did not reinstate him. The trier of fact might conclude from this evidence that Plaintiff's failure to return the van was a pretextual reason (because it was not a termination type offense); that his failure to cooperate was a pretextual reason (because the facts about whether Plaintiff refused to cooperate are disputed and, in any event, he had already

attended one interview and denied that he was involved in illegal drug activity and Verizon had already suspended him);[34] and that his alleged involvement in the sale or transfer of illegal drugs was itself a pretextual reason (because the facts surrounding this issue are disputed and highly dubious and even after the criminal complaint was dismissed, Verizon did not reinstate him).

In its reply brief, Defendant contends that Plaintiff misrepresents what McGovern said:

Q. Was the violation by Mr. Gilliam with respect to not returning his vehicle on time, was that a termination type offense in your mind at that time?

***

A. By itself, no, but in conjunction with the other sets of facts and circumstances, yes.

***

Q. What other facts and circumstances are you referring to that would make that a termination type offense?

A. The fact that he was charged with being involved in drug activity, the fact that he took the company vehicle without authorization, wasn't performing Verizon work and didn't return it, didn't have permission to be using it, wasn't conducting Verizon business, and the failure to cooperate in the company investigation of his case.

(McGovern Dep. 17:7-18:6.)[35]  It also cites cases that have held that employers had a legitimate, non-discriminatory reason when they terminated employees who misused company vehicles.

See Sims v. Trinity Servs., Inc., 2014 WL 2922817, at *5 (N.D. Ill. June 26, 2014); Waters v. Maryland Dept. of Transp., 2009 WL 2757098, at *4 (D. Md. Aug. 26, 2009), aff'd mem., 396 F.

---

[34] It must be noted that Defendant supports its position that Plaintiff "refused" to attend a second interview by citing not to Yarnot's deposition, where he could have been cross-examined about the point, but to a declaration in which Yarnot states only that he "did not agree to attend the interview."  Relying upon this declaration, as opposed to Plaintiff's testimony, the testimony of Wire, Yarnot's admission at the arbitration hearing and the finding of the arbitration panel, does not apply the standard of construing the facts in the light most favorable to the non-moving party and drawing all reasonable inferences and resolving all doubts in that party's favor.

[35] ECF No. 87 Ex. 2.

App'x 938 (4th Cir. 2010).

However, Plaintiff was not citing McGovern's deposition but Yarnot's summary, according to which it was Crompton who informed McGovern that Plaintiff's misuse of the Verizon van was not a termination type offense. (ECF No. 85 Ex. D at 7.) Moreover, the record is undisputed that Verizon did not terminate Plaintiff's employment based on his misuse of the van – which it was aware of on March 16, 2012 – but that the case was closed on March 20, 2012, then reopened on March 23, 2012 when Verizon Security read the newspaper article, accessed the criminal complaint and affidavit and concluded that he was involved in the sale of illegal drugs, at which point he was suspended, not terminated.

Defendant argues that it did not have to reinstate Plaintiff when the criminal complaint was dismissed because: 1) he did not make a specific request for reinstatement; 2) it was not required to take any action until ordered to do so by the arbitration panel; and 3) Verizon had three reasons for terminating Plaintiff's employment, not just one. These arguments must be rejected. First, there is no basis to conclude that Plaintiff, who had already filed this case (which was stayed pending the result of the arbitration) and had filed an arbitration, both seeking reinstatement, had to submit an additional request for reinstatement once the criminal charges were dismissed. With respect to Verizon's duties under the collective bargaining agreement, it may well be that it was under no obligation to act until ordered to do so by the arbitrators, but for purposes of this case, the failure to reinstate constitutes evidence of pretext that the trier of fact will have to consider. Finally, although Defendant contends that it had three reasons for terminating Plaintiff's employment, this is circular reasoning. As noted above, Plaintiff has pointed to evidence that failing to return the vehicle was not a termination type offense and his alleged "refusal" to cooperate in the investigation is not supported.

Defendant cites the Sarullo case, in which a postal employee who had been terminated for selling drugs in a Post Office contended that both his firing and the Postal Service's failure to rehire him (after the jury was unable to reach a verdict on the criminal charges and the prosecution moved to dismiss the indictment) constituted age and race discrimination. The Court of Appeals held that Sarullo could not establish a prima facie case because the manager who decided not to reinstate him did not know his race or age and merely followed a USPS policy of denying reemployment to former employees who had been removed from their positions for cause. 352 F.3d at 799. In addition, the court held that, even if Sarullo could establish a prima facie case, USPS articulated a legitimate, non-discriminatory reason for its action and he proffered no evidence of pretext.

In this case, by contrast, although Crompton and Mattera have stated that they did not know Plaintiff's race at the time they made the decision to fire him, Plaintiff has pointed to evidence that their decision was influenced by Verizon Security officers who did know his race, at least one of whom had subjected him to treatment that he and his union representative perceived as racially discriminatory. Moreover, Defendant has not argued that Crompton and Mattera were still unaware of Plaintiff's race when they failed to reinstate him after the criminal charges were dismissed (assuming they were the individuals who made this decision). Indeed, Defendant has not identified who was responsible for the decision not to reinstate Plaintiff once the criminal complaint was dismissed, although Crompton testified that she "never considered" the idea because "an arbitrator was going to make that decision." (Crompton Dep. 49:16-22.) Nor has Verizon pointed to a policy of not reinstating employees who were dismissed for cause, particularly when the "cause" has been removed from the equation. Moreover, the arbitration panel concluded that Verizon did not have "cause" to terminate Plaintiff's employment and he

was reinstated.

Defendant also cites Ramos v. EquiServe, 146 F. App'x 565 (3d Cir. 2005), to support the argument that an employer who acts unfairly in rushing to judgment by relying on arrest records rather than waiting for convictions has a legitimate, non-discriminatory reason for terminating an employee. Defendant states that Ramos even provided his employer with court records verifying the dismissal of court charges against him, but that the Court of Appeals concluded that the fact that this did not change anything did not demonstrate pretext. However, in that case, which the court described as a "tale of poor communication," Ramos provided the documentation of the dismissal of the charges to the client (EquiServe) but not to the temporary employment agency for which he worked (Addeco), EquiServe told Addeco that Ramos could return to work there, Addeco asked for a release but EquiServe never provided it and he was not reassigned there. Id. at 567. In this case, there is only one employer involved and Verizon was aware that the criminal complaint against Plaintiff was dismissed. More significantly, the Ramos case did not concern the issue of reinstatement, but only whether the defendants discriminated against Ramos by removing him from the EquiServe assignment.

As the Supreme Court has recognized, "[s]ubstantial changes over time in [an] employer's proffered reason for its employment decision support a finding of pretext." Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez, 561 U.S. 661, 737 (2010). Defendant argues that Plaintiff attempts to "divide and conquer" its three reasons for terminating him, rather than considering them together. This kind of argument has been rejected by the Court of Appeals. See Fuentes , 32 F.3d at 764 n.7 ("If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder.")

In this case, the record contains evidence that: 1) Verizon first contended that it was only interested in Plaintiff's failure to return the van to its usual garage at the end of his workday, which it acknowledged was not a termination type offense; 2) Verizon interviewed Plaintiff (who denied being involved in drug activity) and then closed the case on March 20, 2012, but reopened it three days later when Verizon Security read a newspaper article that did not mention Plaintiff, accessed the unsealed criminal complaint and affidavit and independently concluded that Plaintiff was guilty of drug charges and he was then suspended; 3) on April 16, 2012, Verizon Security started asking Plaintiff for a second interview (even though he had already been interviewed and denied the charges, he had notified Security that he was not named in the indictment and he had already been suspended) and when he asked to bring a lawyer with him, Verizon concluded that he was "refusing to cooperate" in the investigation and added this reason to its termination letter; and 4) although Verizon initially indicated that he could be reinstated if the criminal complaint was dismissed, when this actually occurred, Verizon claimed that he failed to ask for reinstatement and that it was not obligated to act until ordered to do so by the arbitrators. Defendant has proffered a number of different reasons at various times for its actions, and they are not consistent with one another.

Plaintiff has pointed to such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons." Fuentes, 32 F.3d at 765. Therefore, with respect to Counts I and II, Defendant's motion for summary judgment will be denied.

Counts III-IV: Retaliation Claims

In Count III, Plaintiff alleges that his suspension without pay, two days after he complained about Yock's conduct, and his subsequent termination constituted acts of retaliatory discrimination for reporting racial discrimination. In Count IV, he alleges that Verizon retaliated against him for filing an EEOC charge by failing to reinstate him after the criminal complaint was dismissed.

Discrimination against an individual who has opposed a practice prohibited by Title VII or who has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under Title VII is itself actionable conduct. A plaintiff may submit a claim for retaliation. 42 U.S.C. § 2000e-3(a).

As summarized by the Court of Appeals for the Third Circuit, the prima facie case elements for a retaliation claim are as follows: 1) the plaintiff engaged in activity protected by the anti-discrimination statute; 2) the employer took action that a reasonable employee would have found to be materially adverse in that it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination; and 3) there is a causal connection between the plaintiff's opposition to or participation in proceedings against unlawful discrimination and the employer's action. Moore v. City of Philadelphia, 461 F.3d 331, 341-42 (3d Cir. 2006). The Court of Appeals has explained that a plaintiff can substantiate a causal connection between the protected activity and an adverse employment action by: 1) showing that the temporal proximity is "unduly suggestive"; or 2) showing "inconsistencies in the defendant's testimony"; or 3) pointing to ongoing antagonism. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000).

Plaintiff contends that he complained about Yock's conduct at the interview, but his complaint was never investigated (it was not even included in Yarnot's reports) and that shortly

thereafter he was suspended and then terminated.  Defendant argues that Plaintiff did not engage in protected activity because his generalized complaint about Yock did not refer to racial discrimination, that the decision makers did not know his race at the time they made their decision, and that he points to no similarly situated comparators.

The Court of Appeals has noted that "while discriminatory conduct persists, violators have learned to leave the proverbial 'smoking gun' behind....  But regardless of the form that discrimination takes, the impermissible impact remains the same, and the law's prohibition remains unchanged.  'Title VII tolerates no racial discrimination, subtle or otherwise.'"  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1082 (3d Cir. 1996) (quoting McDonnell Douglas 411 U.S. at 801).  In Aman, two black employees (Aman and Johnson) appealed the district court's grant of their former employer's motion for summary judgment on the basis that they had failed to demonstrate the existence of a racially hostile work environment.  They did not allege that they had been called names that were overtly racial, but instead they were referred to by what the Court of Appeals called "inherently racist remarks" such as "another one," "one of them," "that one in there," and "all of you."  The court also noted that other black employees were harassed on a daily basis by employees at Cort Furniture, who hurled insults such as "don't touch anything," and "don't steal."  The court stated that "Aman and Johnson were also subjected to apparently false accusations of favoritism, incompetence, and were made to do menial jobs.  The evidence of record shows that white employees were not treated in a similar fashion."  Id.

In this case, Yock called Plaintiff a "fucking felon."  Although this comment was not overtly racial in nature, Plaintiff has pointed to evidence that: 1) he has no felony criminal record; 2) when Yock said this, Yarnot pulled him from the room; 3) both Plaintiff and Wire felt

that the comment was racially motivated and complained about it immediately to Flood; 4) Yock's comment was never reported in the record and Plaintiff's complaint about Yock was never investigated; and 5) Wire encouraged Plaintiff to file a complaint about it. Under these circumstances, the fact that Yock's comment was not overtly racial is of no moment.

In addition, "a plaintiff need not prove the merits of the underlying discrimination complaint, but only that 'he was acting under a good faith, reasonable belief that a violation existed." Aman, 85 F.3d at 1085 (citations omitted). Thus, Plaintiff does not need to prove that Yock's conduct was racially discriminatory, only that he was acting under a good faith, reasonable belief that it was. He has stated a prima facie case of retaliation discrimination.

With respect to Count IV, Defendant argues that Plaintiff has failed to establish a causal connection between his "initial filing with the EEOC" – which was filed on December 28, 2012 – and Verizon's failure to reinstate him once the criminal complaint was dismissed on December 11, 2013, or one year later. Plaintiff responds that he has pointed to ongoing antagonism in the form of Yarnot checking the court records to determine if the criminal complaint was dismissed but taking no action upon learning of this information.

As an initial matter, it is noted that Plaintiff filed his EEOC charge on March 11, 2013. (Am. Compl. Ex. E.) Defendant offers no explanation for its reference to his "initial filing," a Discharge Intake Questionnaire, which was filed on December 28, 2012. (Am. Compl. Ex. A.) More importantly, temporal proximity is only one method of establishing causation. Plaintiff is alleging that, after he filed his complaint with the EEOC that he was subjected to racial discrimination, Defendant retaliated against him by failing to reinstate him once the alleged reason for his discharge – the criminal complaint – had been dismissed. As this Court has already held, Plaintiff can point to this sequence of events to support his case. He has pointed to

ongoing antagonism (Yarnot continued to check court records and learned that the criminal complaint was dismissed but did not notify anyone; Crompton learned that the complaint was dismissed but maintained that Verizon had no obligation to take action until ordered to do so by the arbitrators) and inconsistencies in Defendant's explanations, as identified above.

As with Plaintiff's claims of racial discrimination, Defendant has proffered a legitimate non-discriminatory reason for firing him and for not reinstating him after the criminal complaint had been dismissed, but Plaintiff has pointed to evidence of pretext. Therefore, with respect to Counts III and IV, Defendant's motion for summary judgment will be denied.

For these reasons, the motion for summary judgment submitted on behalf of the defendant (ECF No. 80) will be denied.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LOUIS GILLIAM,                          )
          Plaintiff,             )
                                 )
   vs                                   )          Civil Action No. 13-1557
                                 )
VERIZON PENNSYLVANIA, INC.,              )
          Defendant.             )

## ORDER

AND NOW, this 20th day of April 2016, for the reasons stated above,

IT IS HEREBY ORDERED that the motion for summary judgment filed by Defendant

(ECF No. 80) is denied.

IT IS FURTHER ORDERED that the motion for oral argument filed by Defendant (ECF

No. 89) is denied.


                              s/Robert C. Mitchell_____
                              ROBERT C. MITCHELL
                              United States Magistrate Judge